IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MONICA POUNCEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV1022 |
| | ) | |
| GUILFORD COUNTY, | ) | |
| MARTY LAWING, in his official | ) | |
| and personal capacities, | ) | |
| HEMANT DESAI, in his official | ) | |
| and personal capacities, and | ) | |
| JEFFREY SOLOMON, in his | ) | |
| official and personal | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before the court is the Motion for Summary Judgment filed by Defendants Guilford County ("the County"), Marty Lawing ("Lawing"), Hemant Desai ("Desai"), and Jeffrey Solomon ("Solomon") (together "Defendants"). (Doc. 30.) Plaintiff Monica Pouncey ("Plaintiff" or "Pouncey") responded in opposition, (Doc. 32), and Defendants replied, (Doc. 34). This motion is now ripe for consideration.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background

Plaintiff, Monica Pouncey, is an African American woman formerly employed by Guilford County. ((Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 32), Affidavit of Monica Pouncey ("Pouncey Aff.") (Doc. 32-2) ¶¶ 4-5.)[1] Defendants are Guilford County, as well as individual Defendants Lawing, County Manager of Guilford County; Desai, Guilford County Chief Information Officer; and Solomon, the Enterprise Technology Team Lead for Guilford County. (Complaint (Doc. 1) ¶¶ 4-7.) Pouncey started working for Guilford County as a software engineer in 2008, (Defs.' Mot. for Summ. J. (Doc. 30), Deposition of Monica Lanae Pouncey ("Pouncey Dep.") (Doc. 30-32) at 5), working as an email administrator on the Enterprise Technology Team, (id. at 23).

Jeffrey Solomon became Pouncey's supervisor in 2014. (Id. at 6.) Pouncey attests that "the atmosphere that surrounded [Solomon] was not positive," as he "looked at his watch" when employees came in late and "did not greet you any time of the

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

day unless he had something to ask of you." (Id. at 19.)
Plaintiff claims that Defendant Solomon had this attitude toward
her and "[o]ther African American people" but, when asked if he
did the same thing to white employees, Pouncey said, "not that
[she] saw." (Id. at 20.) Pouncey also got "half communication or
no communication" and "drastically low" performance reviews with
Solomon as her supervisor. (Id. at 19.) Moreover, Solomon did
not bring up problems with Pouncey's work until it was time for
her performance reviews, so she lacked "an opportunity to
address those issues." (Id.) When Solomon presented her with
performance reviews, he failed to provide evidence for why she
was scored so poorly. (Id. at 24.)

Plaintiff alleges that two white employees, Teresa Wilson
and Brett Pennington, "always were favorite in everything that
[Solomon] wanted done." (Id. at 21.) Plaintiff claims that
training requests by white employees were granted, while
requests by African American employees were denied. (Id.) She
argues, in a conclusory fashion, that she received fewer
opportunities and training than other employees. However, the
training log provided by Defendants shows Pouncey received more
training than anyone else on the Enterprise Technology Team,
having attended seven training sessions. (IS Department Training
Log ("Training Log") (Doc. 30-23).) Three of the trainings on

the log occurred "prior to Solomon becoming [Pouncey's] supervisor." (Pouncey Aff. (Doc. 32-2) ¶ 27.) Taking this into account, Plaintiff received four trainings under Solomon – more than almost all of Solomon's direct reports, including Jeffrey Dietz (white), Brett Pennington (white), Jessica Starke (black), Wayne Streeter (black), and others not mentioned in Pouncey's affidavit. (Training Log (Doc. 30-23); <u>see also</u> Pouncey Aff. (Doc. 32-2) ¶¶ 8, 13.) Teresa Wilson was Solomon's only direct report – out of seven – who received more training under his supervision than Pouncey. (Training Log (Doc. 30-23).) Plaintiff does not offer any evidence to dispute these training logs, and this court therefore finds that Wilson and Plaintiff received more training than anyone else. Solomon never made any racial comments directed at Plaintiff, nor has he made any racial comments in her presence. (Pouncey Dep. (Doc. 30-32) at 23.) Pouncey concluded that Solomon "has a personal vendetta" against her. (<u>Id.</u> at 24.)

Pouncey also claims Hemant Desai treated her differently because of her race. She cited "previous issues that he has questioned or belittled" her. (<u>Id.</u> at 18.) Desai "berated" her on a conference call in either 2015 or 2016 about a project when Pouncey "was asked a question that [she] didn't have the answer to at that moment" – Desai told her that she "wasn't prepared."

(Id. at 17-18.) This did not occur on any other conference calls. (Id. at 18.) However, Pouncey claims Desai "questioned [her] more so than any other employee" and "constantly told [her she] wasn't knowledgeable." (Id. at 18-19.) Pouncey claims that Desai had "something personal" against her and he was "very sarcastic" and "condescending" towards her. (Id. at 19.) Plaintiff states that Desai has never made any racially derogatory statements or comments to her. (Id. at 18.)

In 2016, Pouncey applied to a senior software engineer position in her department. (Id. at 21.) The opening was initially removed before the application deadline and before Pouncey had applied. (Id.) Soon after the opening was removed, the interview panel – which included Desai, Solomon, and Bridgett Lindsey ("Lindsey"), announced they had given the job to one of Pouncey's white teammates. (Id.)

On June 29, 2017, another senior software engineer position opened. (Id. at 16.) Pouncey applied the day the posting was sent out. (Id.) The only two applicants were Pouncey and Brett Pennington ("Pennington"), who is white. (Id.) Pouncey was terminated two months before the position was filled. (Affidavit of Graham Rothrock ("Rothrock Aff.") (Doc. 30-29) ¶ 13.)

One of the central issues in this case is Plaintiff's alleged unauthorized access to certain email accounts. The facts

are relatively undisputed. On September 21, 2017, Solomon and another employee were investigating an instance of a different employee's unauthorized access to an email account. Upon investigation, they discovered Plaintiff had unauthorized access to the accounts of two of her co-workers. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Br.") (Doc. 31) at 5.) After Plaintiff mistakenly accused a co-worker of having access to her account, (id. at 6), Solomon conducted "an audit of Plaintiff's access permissions." (Id. at 7.) At this point, Solomon discovered that Plaintiff also had unauthorized access to the accounts of Desai and Graham Rothrock, "among others." (Id.) Pouncey acknowledges granting herself permissions to access Desai's email account the afternoon of June 29 – the day the senior software engineer position was posted – and then removing that access an hour later. (Pouncey Dep. (Doc. 30-32) at 16.) Pouncey also acknowledges that she gave herself permissions to access the email inbox of Rothrock, who works in recruitment within the department, at 9:53 p.m. on July 3 – outside of work hours. (Id.) Pouncey claims this access was for the Barracuda project, though she used her personal ID, rather than her email testing ID, to access the emails. (Id.)

On September 28, 2017, Pouncey was brought into a meeting with June Harley, Ray Willis, and Desai to discuss her suspected

violation of county email policies. (Id. at 13, 17.) She was asked about her access to Rothrock's account after applying for the senior position. (Id. at 13.) Pouncey was also asked about access at various times to the inboxes of Lisa Canter, Teresa Wilson, and Desai himself. (Id. at 13-14.) Plaintiff claimed she accessed the accounts as part of her work on the MDM and Barracuda projects. (Id. at 13.) Desai told Pouncey that the IT department may only access mailboxes upon formal requests when appropriate. (Id. at 14.) Plaintiff claimed to have permission from Lisa Canter and Teresa Wilson but agrees she did not have permission to access the mailboxes of Rothrock or Desai. (Id.) At the meeting, Pouncey was told that "gaining access to employee email accounts without the proper authorization" and "for personal gain" was "unacceptable personal conduct." (Id. at 17.) Plaintiff was placed on administrative leave without pay, "pending a review/investigation into recent events." (Id. at 30.) Plaintiff claims she had no reason to believe June Harley treated her differently because of her race and is unsure whether Willis treated her differently because of race. (Id. at 17.)

Plaintiff was terminated effective October 18, 2017. (Id. at 31.) On October 26, 2017, Pouncey appealed her termination. (See Doc. 30-12.) The termination and underlying allegations

were investigated by Human Resources employees including Clarence Grier and Marty Lawing, who upheld the termination on multiple grounds. (Doc. 30-13.) Pouncey and Lawing have never met, (Pouncey Dep. (Doc. 30-32) at 8), and Grier is himself African American. (Affidavit of Clarence Grier ("Grier Aff.") Doc. 30-27 ¶ 2.)

After she was terminated, Defendants discovered Pouncey had "unrestricted and full access" to the email accounts of individuals in "high level positions," including members of the Guilford County Board of Commissioners, the Guilford County Sheriff, the County Manager, the Guilford County Attorney, and the Director of Social Services. (Affidavit of Jeffrey Solomon ("Solomon Aff.") (Doc. 30-26) ¶ 38.) Contrary to what Plaintiff had previously claimed, (Doc. 30-2), she accessed these accounts via her personal username as well as her typical email test username. (Solomon Aff. (Doc. 30-26) ¶ 38.) Pouncey was contacted by co-workers who overheard Solomon claiming he was going to have Pouncey arrested. (Pouncey Dep. (Doc. 30-32) at 22.) Solomon had allegedly been gloating about Pouncey's termination. (Id.) A police investigation was conducted into Pouncey's email access, but no criminal charges were brought. (Doc. 30-15.)

**B.    Procedural Background**

Pouncey filed this action on December 17, 2018. (Doc. 1.)
Pouncey originally brought eight claims: Race Discrimination
(Failure to Promote/Hire) under Title VII (Claim One); Race
Discrimination (Failure to Promote/Hire) under 42 U.S.C. § 1981
(Claim Two); Retaliation (Failure to Promote/Hire) under Title
VII (Claim Three); Retaliation (Failure to Promote/Hire) under
42 U.S.C. § 1981 (Claim Four); Race Discrimination (Termination)
under Title VII (Claim Five); Race Discrimination (Termination)
under 42 U.S.C. § 1981 (Claim Six); Retaliation (Termination)
under Title VII (Claim Seven); and Retaliation (Termination)
under 42 U.S.C. § 1981 (Claim Eight). (Id.)

Defendants filed a motion to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6), (Doc. 7). On March 17, 2020, this court
entered a Memorandum Opinion and Order, (Doc. 17), and granted
in part and denied in part Defendants' motion to dismiss. Claims
Three, Four, Seven, and Eight – all retaliation claims - were
dismissed in their entirety. (Id. at 43.) Claims One and Five
under Title VII were dismissed with regard to the individual
Defendants Lawing, Desai, and Solomon. (Id.) Remaining are
Claims One, Two, Five, and Six – all of which are brought
against Defendant Guilford County. Also remaining are Claims Two

and Six which are brought against the individual Defendants Lawing, Desai, and Solomon.

Defendants filed a Motion for Summary Judgment on December 23, 2020, (Defs.' Mot. for Summ. J. (Doc. 30)), along with a supporting brief (Defs.' Br. (Doc. 31).) Defendants included a variety of exhibits, including Plaintiff's deposition, and affidavits from other County employees and all individual Defendants. (See Defs.' Mot. for Summ. J. (Doc. 30).) Defendants seek Summary Judgment "with regard to Plaintiff's claims for race discrimination based on termination and failure to promote under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981." (Id. at 1.) This extends to all claims pending for the court's resolution: Claim One (Title VII Failure-to-Promote) against the County, Claim Two (Section 1981 Failure-to-Promote) against all Defendants, Claim Five (Title VII Wrongful Termination) against the County, and Claim Six (Section 1981 Wrongful Termination) against all Defendants.[2]

## II.  __STANDARD OF REVIEW__

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to

---

[2] Defendants also make a persuasive case for Plaintiff to be barred from reinstatement or front pay. (Doc. 31 at 24-25.) Since this court is granting summary judgment on all counts, it need not address the question of equitable relief.

judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex
Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court's
summary judgment inquiry is whether the evidence "is so one-
sided that one party must prevail as a matter of law." Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving
party bears the initial burden of demonstrating "that there is
an absence of evidence to support the nonmoving party's case."
Celotex Corp., 477 U.S. at 325. If the "moving party discharges
its burden . . . , the nonmoving party then must come forward
with specific facts showing that there is a genuine issue for
trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th
Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be
granted "unless a reasonable jury could return a verdict for the
nonmoving party on the evidence presented." McLean, 332 F.3d at
719 (citing Liberty Lobby, 477 U.S. at 247-48). "Mere
allegations" in support of a party's pleadings without "any
significant probative evidence" to support those allegations do
not provide sufficient evidence to allow a reasonable jury to
resolve a dispute in favor of that party. Liberty Lobby, 477
U.S. at 249; see also Brown v. Sears Auto. Ctr., 222 F. Supp. 2d
757, 761 (M.D.N.C. 2002) ("[T]he non-moving party cannot rely

solely on unsupported assertions to demonstrate that a genuine issue of material fact exists.").

Put another way, simply showing some "metaphysical doubt as to the material facts" is not sufficient to establish a genuine dispute. Matsushita, 475 U.S. at 586–87. In considering whether a genuine issue of material fact exists, the court must be careful not to weigh the evidence or make credibility determinations. Liberty Lobby, 477 U.S. at 250. Instead, the court must view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in favor of that party. Id. at 255.

## III. **ANALYSIS**

### A. **Claims One and Two: Failure to Promote**

This court will begin by assessing Plaintiff's first two claims, which allege discriminatory failure to promote under Title VII and 42 U.S.C. § 1981. As these claims have the same elements, the court will assess them together. See Williams v. Giant Food Inc., 370 F.3d 423, 430 n.5 (4th Cir. 2004) ("The same elements are required for failure-to-promote claims alleged under Title VII and § 1981, and the district court properly considered these claims together."). Plaintiff brings both claims against the County and a claim under § 1981 against the individual Defendants.

A prima facie failure to promote claim requires a plaintiff
to demonstrate "that (1) she is a member of a protected group,
(2) she applied for the position in question, (3) she was
qualified for that position, and (4) the defendants rejected her
application under circumstances that give rise to an inference
of unlawful discrimination." Anderson v. Westinghouse Savannah
River Co., 406 F.3d 248, 268 (4th Cir. 2005); see also Bryant v.
Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 544-45 (4th Cir.
2003); Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994). It is
undisputed that Plaintiff is a member of a protected group. The
parties also agree that Plaintiff applied for the position
before her termination, though it was not filled until after she
was fired. The parties dispute whether Plaintiff is qualified
for the position, given she was terminated prior to the internal
position being filled.

Plaintiff "worked for Guilford County as a Software
Engineer for almost a decade at the time of her application" and
"was the second-most tenured member of the Enterprise team by
four years, and the longest tenured non-Senior Software Engineer
by six years." (Pl.'s Resp. (Doc. 32) at 10.) Taking the facts
in the light most favorable to the nonmoving party, absent her
termination, Plaintiff would have been objectively qualified for
the promotion. However, Plaintiff was no longer an employee when

the internal position was filled, as she "had already been terminated for misconduct." (Defs.' Br. (Doc. 31) at 20.) In fact, "Plaintiff was discharged two months before the position . . . was filled." (Id.) This, Defendants argue, means Plaintiff was inherently not qualified for the position at the time it was filled, and disqualifies her failure to promote claim. (See id.)

As this court noted in its Memorandum Opinion and Order, (Doc. 17 at 28 n.10), other courts have dismissed failure to promote claims at summary judgment when the plaintiff was terminated prior to the promotion decision. See Oliver v. Nat'l Beef Packing Co., LLC, 294 F. App'x 455, 458 (11th Cir. 2008) ("[The plaintiff] failed to present[] a prima facie case of discrimination regarding his failure to promote claim because [the defendant] had terminated his employment prior to making the decision and filling the . . . position at issue."). Here, before ruling Plaintiff was not qualified for the promotion due to her termination, this court provided leeway for Plaintiff to conduct discovery and uncover whether the termination was merely a pretextual excuse to avoid promoting her. However, Plaintiff has failed to create a genuine dispute of material fact as to whether her termination was pretextual. See discussion infra Section III.C.2. Thus, at this stage, Plaintiff has failed to

demonstrate she was qualified for the promotion, given her termination two months prior to the position being filled.[3]

## B.  Claim Five: Title VII Wrongful Termination

Plaintiff brings wrongful termination claims under both Title VII and 42 U.S.C. § 1981. This court will first analyze Plaintiff's Title VII wrongful termination claim against the County.

---

[3] Even if this court were to accept Plaintiff's prima facie case and move on to the McDonnell Douglas analysis on the failure-to-promote claims, Plaintiff would ultimately be unable to demonstrate that her employer's failure to promote her was discriminatory. Plaintiff points to her earlier denied application for a promotion as evidence of discrimination, arguing that this time around she was terminated instead. However, "[A] plaintiff's perception of [her] own experience, performance, and skills is not relevant. It is the perception of the decisionmaker that counts." Benson v. Vaughn Indus. LLC, 450 F. Supp. 3d 655, 666 (E.D.N.C. 2020). While Plaintiff may believe she was supremely qualified for a promotion, her own view of her fitness for the job is irrelevant. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 271 (4th Cir. 2005) ("[The plaintiff] may not choose the criteria on which she wishes to compete . . . for the promotion. Moreover, she cannot establish pretext by relying on criteria of her choosing when the employer based its decision on other grounds."). Plaintiff received a lower score on her previous promotion evaluation than her sole competitor – and one of the panelists evaluating Plaintiff was herself African American. Anderson, 406 F.3d at 270 ("[T]he deciding factor in the promotion decision was the rating . . . that each applicant who was interviewed received. . . . A comparison of the two rating forms, compiled by the same interview panel, indicates that the panel found [the plaintiff's competitor] to be the superior candidate.").

There are two ways that Plaintiff can defeat a motion for summary judgment in a Title VII discriminatory termination case. The first is through direct evidence of discrimination: "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). In the present case, Plaintiff does not allege any statement indicating that Plaintiff's race played a direct role in her termination.

Instead, Plaintiff pursues the second path to defeating a motion for summary judgment, under the framework from McDonnell Douglas v. Green, 411 U.S. 792 (1973). The McDonnell Douglas test requires Plaintiff to demonstrate four elements to prove a prima facie case of racial discrimination: (1) that she is a member of a protected class; (2) she suffered an adverse employment action; (3) that Plaintiff was performing well enough to meet the legitimate expectations of her employer; and (4) the adverse employment action gives rise to an inference of unlawful discrimination. McKiver v. Gen. Elec. Co., 11 F. Supp. 2d 755, 758 (M.D.N.C. 1997). Here, the first element is satisfied: it is undisputed that Plaintiff is African American and therefore a

member of a protected class. The second element is also undisputed, as Plaintiff was terminated from her position. At issue are only the third and fourth elements: Plaintiff's performance and her termination giving rise to an inference of unlawful discrimination. Assuming Plaintiff has stated a prima facie case for wrongful termination,[4] this court will proceed through the McDonnell Douglas analysis.

### 1. Legitimate, Nondiscriminatory Reason for Termination

Once Plaintiff has established a prima facie case, the burden shifts to Defendants "'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" Lettieri v. Equant Inc., 478 F.3d 640, 646 (4th Cir. 2007) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)). Plaintiff was allegedly terminated because of her unauthorized access of the

---

[4] Plaintiff has not necessarily met this burden, though this court ultimately dismisses Plaintiff's claim under a full McDonnell Douglas analysis. A prima facie inference of unlawful discrimination can be drawn when Plaintiff is passed over for, or replaced by, a similarly qualified white employee. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 650 (4th Cir. 2002) (assessing whether "similarly situated employees were selected for upgrades on the basis of race"). The employee hired in Plaintiff's place was also African American, undermining any circumstantial presumption that race discrimination was a reason for her termination. (Solomon Aff. (Doc. 30-26) ¶ 47.)

email inboxes of a variety of individuals. More specifically, the County upheld her termination on three main bases: (1) "[i]nsubordination and failure to follow supervisory directives," (2) "[d]isplaying poor judgment and lack of integrity," and (3) "[c]reating a conflict of interest by using [her] position to access the mailboxes of individuals involved in the hiring process for a position that [she] applied for." (Appeal Dismissal Notice by M. Lawing November 20, 2017 ("Appeal Dismissal") (Doc. 30-14) at 1.) The County Manager provided an additional basis that Plaintiff "provided false or misleading statements and information during the investigation." (Id.)

Solomon's affidavit indicates the office's email access permission policy was a "standard practice that ha[d] been conveyed to all staff and followed by other staff members," and notes that "Plaintiff was fully aware of these practices . . . as evidenced from her following those exact processes on other occasions." (Solomon Aff. (Doc. 30-26) ¶¶ 42-43.) Brett Pennington corroborates that "management has always required authorization for full access to the entire content of an end-user's email box," in large part "due to the sensitive nature of some of the County offices." (Affidavit of Bretton Pennington ("Pennington Aff.") (Doc. 30-30) ¶ 22.) Pennington claims he has "never accessed another employee's or co-worker's email box

without prior consent and authorization" and would not need to within the job. (Id. ¶ 21.) Employee Teresa Wilson notes that, although it was not in writing, "this directive [to obtain pre-approval before searching another employee's email] has been in place since I have been employed with GCIS" in order "to maintain the integrity of GCIS with other County departments and to prevent the actual or perceived unauthorized invasions of privacy and unauthorized access to confidential and sensitive human resource, legal, and law enforcement information." (Affidavit of Teresa Wilson ("Wilson Aff.") (Doc. 30-31) ¶ 27.) Plaintiff disputes that this policy existed, claiming it was merely an excuse for her termination.

Though Defendants have put forth ample testimonial evidence indicating such an informal policy did exist, it is not this court's role to weigh Plaintiff's credibility against the credibility of Defendants' witnesses. However, Plaintiff's disagreement with her employer about the existence of an email access policy is not dispositive. This dispute alone is not enough to sustain a wrongful termination claim through the summary judgment stage. See JKC Holding Co. v. Washington Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) ("The existence of an alleged factual dispute . . . will not defeat a properly supported motion for summary judgment, unless the

disputed fact is one that might affect the outcome of the litigation."). There is evidence that Plaintiff violated what was, at minimum, an informal company policy, and that even upon supervisory review, this was one of several legitimate, nondiscriminatory reasons for terminating Plaintiff. The Fourth Circuit addressed a similar set of facts in a wrongful termination case from 2013:

> There is considerable evidence that [the plaintiff] violated a clearly communicated company policy forbidding delivery records falsification — a policy upon which FedEx's commercial viability depends. There is also considerable evidence that the company genuinely believed in this reason for terminating [the plaintiff]. And perhaps most importantly, not only did [the plaintiff] fail to adduce any comparator evidence in her favor, but the only comparator identified in the summary judgment record . . . was treated in the exact same manner as [the plaintiff] after violating the exact same company policy in the exact same way.

Laing v. Fed. Exp. Corp., 703 F.3d 713, 722–23 (4th Cir. 2013). The initial reason for Pouncey's termination, prior to the County's investigation, was legitimate and nondiscriminatory. She was terminated "for unacceptable personal conduct related to her unauthorized access to Guilford County employee email accounts, but particularly for her access to Graham Rothrock's email account . . . close in time to her applying for the Senior Software Engineer" position. (Aff. of Hemant Desai (As Chief Information Officer and Director of Guilford County Information

Services) (Doc. 30-25) ¶ 29.) Plaintiff then disputed and appealed her termination; however, it was upheld based on "[i]nsubordination and failure to follow supervisory directives," "creating a conflict of interest," and displaying "poor judgment and lack of integrity." (Appeal Dismissal (Doc. 30-14) at 2.) Whether the County was wise in its decision to terminate Plaintiff, or whether the email policy was a formal or informal one, is immaterial.

Moreover, the termination was approved by individuals against whom Pouncey alleges no racial bias. The County Human Resources Manager, Ray Willis, and the Deputy County Manager, Clarence Grier, both of whom represented the County in the decision to terminate Plaintiff, are themselves African American. (See Affidavit of Ernest Ray Willis ("Willis Aff.") (Doc. 30-28) ¶¶ 2-3; (Grier Aff. (Doc. 30-27) ¶¶ 2-3.) Willis recounts his decision process as follows:

> I reviewed the results and compared them against the County's disciplinary processes under the relevant Personnel Regulations. I participated in the discussions to determine whether any disciplinary action was appropriate. I also attended both meetings between Plaintiff, Hemant Desai, and Jeffrey Solomon on September 28, 2017 regarding her suspension and on October 18, 2017 regarding her termination from employment.

(Willis Aff. (Doc. 30-28) ¶ 18.) Willis echoed the same concerns as those expressed by Desai. He found that Plaintiff was

"subject to termination" due to "her additional access to Graham Rothrock's email account from July 3, 2017 through July 17, 2017." (Id. ¶ 24.) "The timing of her access was determined not to be coincidental to her application for the Senior Software Engineer position for which she applied on June 29, 2017." (Id.) Further, Plaintiff's access to the email accounts "constitute[d] a major breach of confidential information in the possession of HR – some of which is subject to HIPAA privacy laws." (Id. ¶ 26.) This confidential data included "social security numbers, medical data, bank account data, salary information, benefits data, employee job searches, and performance evaluations." (Id. ¶ 27.) According to Willis, this risked putting the County in legal trouble. (Id. ¶ 28.)

It is a matter of material dispute, at this stage, whether an established office policy required Plaintiff to obtain explicit permission before accessing these inboxes. However, the County's conclusion that Plaintiff accessed the HR email account in order to gain an advantage in the promotion process is not an issue of material fact. Whether it is a true conclusion or a false one is not for this court to determine. Plaintiff has provided no evidence to contradict the substantial evidence that

this was the County's genuine conclusion and basis for action.[5]
The conclusions drawn by County representatives constitute
legitimate and nondiscriminatory reasons for terminating
Plaintiff, regardless of the disputed email policy.

### 2. Stated Reason for Termination is Not Pretextual

Since the County has provided a legitimate explanation for
Plaintiff's termination, the burden shifts back to Plaintiff to
prove by a preponderance of the evidence that this articulated
reason is mere pretext. McKiver, 11 F. Supp. 2d at 758. "The
final pretext inquiry 'merges with the ultimate burden of
persuading the court that [the plaintiff] has been the victim of
intentional discrimination,' which at all times remains with the
plaintiff." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d
289, 294 (4th Cir. 2010) (quoting Tex. Dep't of Cmty. Affairs v.
Burdine, 450 U.S. 248, 256 (1981)).

Plaintiff offers no evidence to indicate the County's
reasoning was anything but genuine. She makes no allegations of
racial bias against Clarence Grier, who handled her appeal.

---

[5] Although not necessary to the result reached here,
Plaintiff is a software engineer and email administrator. Her
failure to recognize the purpose of proper authorizations to
access email accounts, and the purpose those authorizations
serve, is striking. Those authorizations clearly exist to
protect the integrity of employees' email accounts and the
authority of those who use those accounts.

(Pouncey Dep. (Doc. 30-32) at 8.) Plaintiff concedes that she
did not know Grier prior to her termination. (Id.) Grier's
investigation concluded that "Plaintiff accessed Graham
Rothrock's email box . . . for the purpose of gaining an
advantage over other applicants for the Senior Software Engineer
position." (Grier Aff. (Doc. 30-27) ¶ 12.) According to his
report, "Plaintiff accessed . . . email boxes . . . without
permission and without a valid business reason," (id. ¶ 13), and
then "falsely accused her supervisor . . . and co-worker . . .
of accessing her emails without permission," (id. ¶ 14). Grier
further concluded that "Plaintiff provided several statements
and explanations that were not credible and were misleading,"
(id. ¶ 15), in addition to "display[in] a lack of integrity" and
"engag[ing] in unethical practices," (id. ¶ 16). He therefore
recommended her termination be upheld on appeal. (Id.)

Moreover, Plaintiff was replaced by another member of the
same protected class. (Solomon Aff. (Doc. 30-26) ¶ 47); see
McCaskey v. Henry, 461 F. App'x 268, 270 (4th Cir. 2012) ("[H]er
claim of discriminatory termination fails because a member of
her protected class was promoted into her position after her
termination."). "[F]ederal courts now routinely rely on
comparator evidence when deciding whether an adverse employment
action was driven by a discriminatory motive." Laing, 703 F.3d

at 719. Here, the only comparator is the individual hired to replace Plaintiff after her termination – an individual who is part of the same protected class as Plaintiff. (Solomon Aff. (Doc. 30-26) ¶ 47.) This undermines Plaintiff's argument that she was terminated because of her race, rather than because of her violations of informal company policy. Plaintiff does not meet her burden of providing evidence, beyond conclusory statements, that the County's reasoning was pretextual. Claim Five will therefore be dismissed.

## C. **Claim Six: 1981 Wrongful Termination**

Plaintiff brings a 42 U.S.C. § 1981 wrongful termination claim against all Defendants. Under § 1981, "a plaintiff bears the burden of showing that race was a but-for cause of its injury." Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, ____ U.S. ____, ____, 140 S. Ct. 1009, 1014 (2020). Defendants seek summary judgment with regard to the sixth claim and their related tenth affirmative defense, qualified immunity.

### 1. **Section 1981 Claim Against County**

Under § 1981, when a plaintiff brings an action against a county, the high bar for § 1983 municipal liability applies. "[W]here a plaintiff seeks to state a claim for violation of rights under § 1981 against a municipality, the same rules with respect to municipal liability apply as are applied under a

claim for violation of § 1983." <u>Beck v. City of Durham</u>, 129

F. Supp. 2d 844, 853 (M.D.N.C. 2000); <u>see also</u> <u>Jett v. Dallas</u>

<u>Indep. Sch. Dist.</u>, 491 U.S. 701, 733 (1989) ("[T]he express

cause of action for damages created by § 1983 constitutes the

exclusive federal remedy for violation of the rights guaranteed

in § 1981 by state governmental units."); <u>Greensboro Pro. Fire</u>

<u>Fighters Ass'n, Local 3157 v. City of Greensboro</u>, 64 F.3d 962,

965 n.3 (4th Cir. 1995) ("[T]he same principles of municipal

liability apply to § 1981 and § 1983 actions.").

> Local governing bodies, therefore, can be sued
> directly under § 1983 for monetary, declaratory, or
> injunctive relief where, as here, the action that is
> alleged to be unconstitutional implements or executes
> a policy statement, ordinance, regulation, or
> decision officially adopted and promulgated by that
> body's officers. Moreover, . . . local governments,
> like every other § 1983 "person," by the very terms of
> the statute, may be sued for constitutional
> deprivations visited pursuant to governmental "custom"
> even though such a custom has not received formal
> approval through the body's official decisionmaking
> channels.

<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978). In

other words, Plaintiff "must allege that [s]he suffered

discrimination . . . caused by an official policy or custom of

the municipality, or that the alleged discrimination resulted

from the actions of an official having express or implied

authority from the [County], as its 'policymaker' in matters of

personnel management." <u>Beck</u>, 129 F. Supp. 2d at 853.

Plaintiff has failed to adequately create a dispute of material fact over whether Guilford County had an "official policy or custom" of discrimination. She has not alleged the County has any particular custom of discrimination. She has not presented any facts to indicate that the County's decisionmakers, specifically Willis and Grier, possess any racial animus against her. See Greensboro Pro. Fire Fighters Ass'n, 64 F.3d at 965 ("When a final decision by an employee implements municipal policy, then municipal liability may follow.").

Nor has she created a genuine dispute of material fact as to whether Desai, Lawing, or Solomon terminated her due to her race. See discussion infra Section III.C.2. Even the Huntley affidavit provided by Plaintiff, (Affidavit of Corey Huntley ("Huntley Aff.") (Doc. 32-6)), makes only a conclusory statement about Solomon, with no accompanying details or facts. Shepherd v. Coastal Cmty. Action, Inc., 602 F. Supp. 2d 686, 694 (E.D.N.C. 2009) ("[The plaintiff's colleague's] vague opinion of racial favoritism by [the defendants] are not sufficient to create a genuine issue of material fact.") Moreover, even if Plaintiff had demonstrated that Desai or Solomon were discriminatory in firing her, she has not shown they were policymakers with final say over County employment. In fact,

Plaintiff herself appealed the decision to County Human Resources, where the termination was upheld.

With regard to Lawing, Plaintiff cites to N.C. Gen. Stat. § 153A-82 and Guilford County Personnel Regulation 28, claiming "the county manager [has] final authority over non-elected county officials and employees." (Pl.'s Resp. (Doc. 32) at 21.) Yet, Plaintiff has not provided a single fact to indicate Lawing terminated her on the basis of race – Plaintiff has never met, seen, or spoken to Marty Lawing. (Pouncey Dep. (Doc. 30-32) at 8.) Plaintiff has simply not provided enough facts to create a reasonable material dispute over whether the County has an official custom of racial discrimination. Therefore, this court will grant summary judgment to the County on this § 1981 claim.

### 2. <u>Section 1981 Claim Against Individual Defendants</u>

In addition to a § 1981 claim against the County for wrongful termination, Plaintiff pursues a § 1981 claim against Defendants Solomon, Lawing, and Desai. The individual Defendants argue that qualified immunity prohibits Plaintiff from pursuing § 1981 wrongful termination claims against them in their individual capacities. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). "[A] constitutional right is clearly established when its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Ridpath v. Bd. of Governors Marshall Univ.</u>, 447 F.3d 292, 313 (4th Cir. 2006) (internal quotation marks and citation omitted).

The question of qualified immunity in discriminatory termination cases has already been squarely addressed by a court in this district. It "would not be objectively reasonable for Defendants to believe they could lawfully terminate Plaintiff based, even in part, on her race," for purposes of qualified immunity. <u>Disher v. Weaver</u>, 308 F. Supp. 2d 614, 628 (M.D.N.C. 2004). Assuming "questions of fact remain as to both the proffered reason for Plaintiff's firing . . . and whether race was a motivating factor," this court would not be able to determine at the summary judgment phase that qualified immunity protects the individual Defendants from liability. <u>Id.</u>

However, no genuine "questions of fact remain" as to the proffered reason for Plaintiff's firing. Plaintiff accuses Defendants Solomon and Desai of holding negative attitudes about black employees but does not provide examples or evidence that demonstrate more than the suggestion of personal animus.

### a.  <u>Defendant Desai</u>

The first individual Defendant is Defendant Desai. Plaintiff alleges race motivated Desai to terminate her, citing a single instance when Desai referred to Plaintiff as "unprepared" – at a time Plaintiff admits she did not have the answer to a question. (Pouncey Dep. (Doc. 30-32) at 18.) Plaintiff's deposition testimony concedes that while Defendant Desai "questioned [her] more so than any other employee," he never made a racially derogatory comment or used any kind of racial epithet towards Plaintiff. (<u>Id.</u>) Plaintiff also alleges Desai had "something personal" against her and generally behaved "in very sarcastic manner" towards her. (<u>Id.</u> at 19.) "[W]orkplace disagreements and incidents of occasional mistreatment are ordinary occurrences in a workplace," and a single example of such an incident – one lacking any overt references to race - is not sufficient to create a genuine dispute of material fact. <u>Julsaint v. Corning, Inc.</u>, 178 F. Supp. 2d 610, 620 (M.D.N.C. 2001). Nor are general allegations of personal animus sufficient. Moreover, Plaintiff has not connected this incident to her firing over a year later. Even if the facts are taken in the light most favorable to Plaintiff, the most that can be inferred from the evidence presented is

that Desai possessed some personal grudge against Plaintiff,
with no further evidence to indicate that bias was race-based.

### b. **Defendant Lawing**

The second individual Defendant is Marty Lawing. Plaintiff
admits she has never so much as seen or spoken to Lawing.
(Pouncey Dep. (Doc. 30-32) at 8.) There is no genuine dispute of
material fact as to whether Lawing held a racial animus against
Plaintiff that influenced her termination.

### c. **Defendant Solomon**

The third and final individual Defendant is Jeffrey
Solomon. Plaintiff provides marginally more evidence of
potential racial bias on the part of Solomon. For example, the
affidavit of former employee Corey Huntley corroborates that
"Solomon treated employees of color differently" and was
"confrontational with black employees." (Huntley Aff. (Doc.
32-6) ¶¶ 7-8.) Huntley, like Plaintiff, does not provide any
specific examples, stating only that while "[w]hite employees
under Solomon had more freedom to accomplish tasks their own
way, . . . black employees had to carefully adhere to Solomon's
preferences." (Id. ¶ 9.) Though more explicit than the evidence
presented regarding Desai or Lawing, this conclusory narrative
is inadequate. A "plaintiff's subjective belief that [a
defendant] treated her differently due to her race and that [a

defendant] ultimately terminated her employment due to her race is not sufficient to create a genuine issue of material fact." Shepherd, 602 F. Supp. 2d at 694. Moreover, none of the allegations relayed tie back to Plaintiff's termination: she does not bring a hostile work environment claim, but rather a wrongful termination claim.

## IV.  CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 30), is **GRANTED** and as to all claims.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**.

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 28th day of June, 2021.

_____
United States District Judge